# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

WILLIAM H. CONNER,                    )
                                      )
        Plaintiff,                 )
                                      )     3:08-cv-00633-RCJ-RAM
    vs.                            )
                                      )
HARRAH'S OPERATING CO., INC. et al.,  )     **ORDER**
                                      )
        Defendants.                )
                                      )
_____ )

       This case arises out of an alleged conspiracy between a Reno casino and three employees of the Nevada Gaming Control Board ("the Board") to recover an overpayment made to a gambler. Plaintiff alleges various torts. Pending before the Court are two motions for summary judgment. For the reasons given herein, the Court grants the motions in part and denies them in part.

## I.    FACTS AND PROCEDURAL HISTORY

       On July 19, 2008, Plaintiff William H. Conner played and won a single hand at a baccarat table at Harrah's Hotel and Casino in Reno, Nevada when he took his winnings and moved to another baccarat table. (First Am. Compl. ¶¶ 2, 5). After forty minutes, a Harrah's manager interrupted the game and told Plaintiff that he had been overpaid at the first table. (*Id.* ¶¶ 6–7). Although the manager indicated the incident had been captured on film, Harrah's never produced the film because the manager admitted it would not show any overpayment; Plaintiff also believes the security officer watching the film during the alleged overpayment could not attest to any

1     overpayment. (*See id.* ¶¶ 8, 10–11, 21).

2         The following morning, Plaintiff met with the casino operations manager who accused

3     Plaintiff of having taken an overpayment, although he did not claim to know the amount. (*Id.* ¶ 9).

4     At the end of the meeting, the casino operations manager told Plaintiff that a gaming control agent

5     would call him. (*Id.* ¶ 13). After the meeting, Defendant Steve Heiman called Plaintiff, and Plaintiff

6     again refuted the allegations that he had been overpaid. (*Id.* ¶ 14).

7         Plaintiff then contacted Heiman's supervisor, Defendant David Andrews, to arrange a

8     meeting at the offices of the Board. (*Id.* ¶ 15). Plaintiff alleges that Andrews deliberately lured

9     Plaintiff to the meeting in order to effectuate Plaintiff's false arrest by Andrews's subordinates. (*Id.*).

10     When Plaintiff arrived at the offices of the Enforcement Division of the Board, Defendants Heiman

11     and Russ Neil confronted him with two other officers. (*Id.* ¶ 16). Heiman and Neil escorted Plaintiff

12     to a room and asked him to place his hands on the table. (*Id.*). Neil frisked Plaintiff and told him he

13     was under arrest for an unspecified felony and that Defendants were going to take him to the Washoe

14     County Detention Center. (*Id.* ¶ 17). Heiman commented that the search indicated Plaintiff's penis

15     was "the size of a Chapstick." (*Id.* ¶ 17). Plaintiff alleges implicitly that the events in this room were

16     recorded. (*See id.*). Heiman and Neil left Plaintiff under the supervision of an unidentified officer,

17     and when they returned they told Plaintiff that he had two options: (1) to be escorted by the agents

18     to Harrah's to repay the overpayment; or (2) to go to jail. (*Id.* ¶ 18). Plaintiff agreed to repay the

19     alleged overpayment under duress. (*See id.* ¶ 19). Heiman and Neil took Plaintiff to Harrah's in a

20     government car, where they met the casino operations manager, who escorted them to the cashier's

21     cage, where Plaintiff paid the alleged overpayment of $950. (*Id.* ¶ 20). One of the agents said, "I'll

22     call you later, buddy!" to the casino operations manager as the agents escorted Plaintiff back to the

23     government car. (*Id.*).

24         Plaintiff sued Harrah's Operating Co., Inc. ("Harrah's"), Heiman, Neil, and Andrews in this

25     Court on fifteen causes of action. (*See* Compl., ECF No. 1). The First Amended Complaint ("FAC")

1  lists fourteen causes of action: (1) Civil Conspiracy; (2) Conversion; (3) Defamation; (4) Fourth

2  Amendment Violations pursuant to 42 U.S.C. § 1983; (5) First Amendment Violations pursuant to

3  42 U.S.C. § 1983; (6) Conspiracy to Violate Plaintiff's Civil Rights pursuant to 42 U.S.C. § 1983;

4  (7) False Arrest; (8) False Imprisonment; (9) Battery; (10) Intentional Infliction of Emotional

5  Distress ("IIED"); (11) Fifth and Sixth Amendment Violations pursuant to 42 U.S.C. § 1983; (12)

6  Respondeat Superior liability against Harrah's; (13) Negligent Supervision against Harrah's; and

7  (14) Declaratory and Injunctive Relief.

8       On July 7, 2009, Judge Brian E. Sandoval granted the State Defendants' motion to dismiss

9  in part, leaving only the fourth and sixth causes of action as against them. (*See* Order 13:27–14:3,

10  July 7, 2009, ECF No. 23).  On February 22, 2010, the Court dismissed the third, forth, fifth,

11  seventh, eighth, ninth, tenth, eleventh, and fourteenth causes of action as against Harrah's, leaving

12  the first, second, sixth, twelfth and thirteenth causes of action. (*See* Order 6:13–18, Feb. 22, 2010,

13  ECF No. 41).  Heiman, Neil, and Andrews (collectively, "the State Defendants") and Harrah's have

14  now separately moved for summary judgment on all remaining causes of action. (*See* Mot. Summ.

15  J., ECF No. 46; Mot. Summ. J., ECF No. 47).

16  **II.    SUMMARY JUDGMENT STANDARDS**

17       The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings,

18  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

19  show that there is no genuine issue as to any material fact and that the party is entitled to a judgment

20  as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of

21  the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material

22  fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

23  nonmoving party. *See id.*  A principal purpose of summary judgment is "to isolate and dispose of

24  factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

25       In determining summary judgment, a court uses a burden-shifting scheme.

1          When the party moving for summary judgment would bear the burden of
     proof at trial, it must come forward with evidence which would entitle it to a directed
2    verdict if the evidence went uncontroverted at trial. In such a case, the moving party
     has the initial burden of establishing the absence of a genuine issue of fact on each
3    issue material to its case.

4    *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations

5    omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

6    defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

7    an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

8    party failed to make a showing sufficient to establish an element essential to that party's case on

9    which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If

10   the moving party fails to meet its initial burden, summary judgment must be denied and the court

11   need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S.

12   144, 159–60 (1970).

13         If the moving party meets its initial burden, the burden then shifts to the opposing party to

14   establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

15   475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party

16   need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

17   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

18   versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

19   626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment

20   by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v.*

21   *List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions

22   and allegations of the pleadings and set forth specific facts by producing competent evidence that

23   shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

24         At the summary judgment stage, a court's function is not to weigh the evidence and

25   determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477

1   U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are

2   to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely

3   colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

4   **III.   ANALYSIS**

5       **A.   Conversion (Harrah's)**

6       The tort of conversion consists of:

7           wrongful exert[ion] [dominion] over personal property in denial of, or inconsistent
            with, title or rights therein or in derogation, exclusion or defiance of such rights.
8           While conversion requires a physical act of dominion over personal property, liability
            for conversion is predicated upon general intent, which does not require wrongful
9           intent and is not excused by care, good faith, or lack of knowledge.

10  *Winchell v. Schiff*, 193 P.3d 946, 950 (Nev. 2008) (footnotes and internal quotation marks

11  omitted) (second alteration in original). A plaintiff need only prove the defendant's intent to

12  exercise dominion over the property where such exercise is indeed wrongful; a plaintiff need not

13  show that the defendant had any wrongful intent. A mistake of fact is no defense to the civil tort

14  of conversion, and good faith versus bad is relevant only to the issue of punitive damages. *See* 2

15  Dan B. Dobbs, *The Law of Torts* § 62, at 129 (Practitioner Treatise Series 2001).

16      Harrah's argues that Plaintiff cannot show any genuine issue of material fact as to

17  Harrah's alleged wrongful dominion over $950 belonging to Plaintiff. Plaintiff need not make

18  such a showing, however, unless Harrah's carries its initial burden of showing a lack of any

19  genuine issue of material fact.

20      Harrah's argues that the surveillance tape shows Plaintiff making a $2000 bet, winning,

21  and receiving a $2850 payment. Harrah's does not produce the tape, but refers to three other

22  exhibits. First, Harrah's cites to the deposition of Eliseo Hernandez, the dealer who made the

23  alleged overpayment. Hernandez testified that he realized he had made an overpayment when an

24  unidentified supervisor noticed it—Plaintiff had been the only player at the table, and the

25  supervisor's money count revealed a deficit. (*See* Hernandez Dep. 9:3–15, Apr. 9, 2010, ECF No.

46 Ex. 3). Second, Harrah's cites to Heiman's deposition. Heiman testified that when he saw he surveillance tape, he thought there had been a $950 overpayment. (*See* Heiman Dep. 13:7–19, Dec. 1, 2009, ECF No. 46 Ex. 6). Third, Harrah's cites to a sealed exhibit consisting of its investigation log and reports concerning the incident. The final page of the exhibit is a probable cause affidavit of unknown date to the Reno Justice Court executed by Heiman, wherein he alleges a $950 overpayment. (*See* Decl. Prob. Cause, ECF No. 46 Ex. 10). The evidence of the bank's deficit at the table where Plaintiff was the only player and Heiman's affidavit together satisfy Harrah's initial burden. Harrah's also notes that Plaintiff admitted at his deposition that he has no knowledge whether he was overpaid. (*See* Conner Dep. 26:9–10, Sept. 14, 2009, ECF No. 46 Ex. 1).

Plaintiff responds that Hernandez admitted that he could not even recall if Plaintiff ever gambled at his table. (*See* Hernandez Dep. 12:16–17, ECF No. 52 Ex. 1). This leaves the only direct evidence as to overpayment to Plaintiff as Heiman's own deposition and probable cause declaration, both of which are based on his having reviewed a security tape that Harrah's has apparently refused to provide. The Court could draw an adverse inference from this failure if Plaintiff had moved to compel production of the tape, but the record does not indicate any such motion. *See* Fed. R. Civ. P. 37. Plaintiff therefore cannot be heard to complain at this stage that Defendant is withholding evidence. Either Plaintiff has failed to demand discovery of the tape, or he has received it and failed to adduce it in response to the present motion. Either way, the Court does not have the tape before it to determine if it creates a genuine issue of material fact as to overpayment. If Plaintiff had testified at his deposition that he was paid the proper amount, the Court would not grant summary judgment to Defendants on the conversion claim, because the Court could not conclude that a reasonable jury could not credit Plaintiff's recollection and discredit Defendants'. However, Plaintiff does not even affirmatively allege in any deposition or affidavit that he was paid the proper amount. As Defendants point out, he affirmatively testified

Page 6 of 14

1  that he did not know if he had been overpaid. (*See* Conner Dep. 26:9–10). And at oral argument

2  counsel admitted there was no dispute that an overpayment occurred. Plaintiff has not met his

3  shifted burden to establish a genuine issue of material fact on the conversion claim, and the Court

4  therefore grants summary judgment to Defendants on this claim.

5      **B.    Fourth Amendment Violations (42 U.S.C. § 1983) (State Defendants)**

6          Defendants' motion is based on their contention that they had probable cause to arrest

7  Plaintiff for violations of Nevada Revised Statutes ("NRS") sections 465.070 (fraudulent acts

8  relating to gambling) and/or 205.0832 (theft) based on the contents of the tape recording of the

9  overpayment and the witness statements of others. These other witness statements, as noted

10 *supra*, appear to all be ultimately grounded in the video tape, not in any first-hand witnessing of

11 the alleged overpayment. As noted, the dealer at the baccarat table where Plaintiff was allegedly

12 overpaid could not remember him having been at the table, and Defendants do not allege that any

13 other witnesses were present when the alleged overpayment occurred, but only that certain

14 witnesses later watched a video tape of the alleged overpayment or spoke to witnesses who did

15 after the dealer's manager noted a deficit in the bank's funds at that table.

16         The question in the context of a probable cause determination, however, is whether an

17 objectively reasonable officer, based on the totality of the circumstances known to the officer at

18 the time, would have had probable cause to believe that a crime had been committed. *See*

19 *Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003). The totality of the circumstances includes

20 the veracity and basis of knowledge of persons providing hearsay evidence. *See Illinois v. Gates*,

21 462 U.S. 213, 238 (1983). The Ninth Circuit "has defined probable cause as follows: when

22 'under the totality of circumstances known to the arresting officers, a prudent person would have

23 concluded that there was a fair probability that [the defendant] had committed a crime.'" *United*

24 *States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (quoting *United States v. Smith*, 790 F.2d

25 789, 792 (9th Cir. 1986)). Under this standard, there remains a question of material fact whether

1   the State Defendants had probable cause to arrest Plaintiff when they detained him at the Board's

2   offices. Although there is no question of fact that a reasonable officer could have believed

3   Plaintiff had committed the requisite actus reus for theft, a reasonable jury could find that there

4   was no probable cause to believe that Plaintiff had the requisite mens rea for theft.

5       Heiman reviewed the video tapes and came to the conclusion himself that they showed an

6   overpayment. Heiman's report, which is supported by affidavit, indicates he reviewed the tape of

7   the disputed bet in fine detail, and it indicated the following: (1) Plaintiff made a bet of two

8   $1000 chips at mini-baccarat table no. 316; (2) the bank won the hand;[1] (3) the dealer,

9   Hernandez, drew four $500 chips from the bank (representing Plaintiff's proper winnings of

10  $2000) and set them next to Plaintiff's chips; (4) Hernandez then placed an additional two $500

11  chips next to Plaintiff's chips, for a total of $3000, before removing his 5% commission on the

12  $3000 total, which came to $150; (5) Hernandez then stacked the $2850 next to Plaintiff's chips;

13  and (6) Plaintiff left the table with his original chips and the $2850 in chips Hernandez had

14  stacked. (Multi-Purpose Report 3–4, Dec. 30, 2008, ECF No. 46 Ex. B, attach 1). Plaintiff's

15  winnings on his $2000 bet should have been $2000 minus a 5% commission of $100, for a total

16  of $1900, hence $2850 was an overpayment of $950. Pit Supervisor Sang Lee discovered that

17  Plaintiff had won $3000 on the table on a single bet, which he realized was impossible because

18  the table limit was $2000. (*Id.* 4). Lee notified Surveillance Operator Gregory Walker and

19  Assistant Casino Manager Linda Coffee. (*Id.*). Lee asked Plaintiff to speak with him, but

20  Plaintiff refused. (*Id.*). Fifty-five minutes after the overpayment, and thirty minutes after Lee

21  discovered the error, Coffee asked Plaintiff to return the $950, whereupon Plaintiff became

22  defensive and demanded to speak with persons in positions of authority. (*Id.*). Heiman called

23  Plaintiff on August 4, 2008, and Plaintiff refused to return the $950, at which point Heiman

24  ─────────────

25      [1]When the bank "wins" in the game of baccarat, the player also wins if he has bet on the
    bank.

1    concluded he had probable cause that Plaintiff had violated NRS section 205.0832 (theft). (*Id.*

2    4–5).

3          A reasonable jury could find a lack of probable cause at this stage. Plaintiff's behavior

4    was consistent with a person who is accidentally overpaid, does not realize it, has no way to

5    confirm or deny it when confronted (because he has been mingling the allegedly overpaid

6    winnings with other funds and gambling with them), who is understandably defensive when

7    accused of theft, and who is understandably suspicious when his accuser refuses to show him

8    alleged evidence it possesses. Unlike in a criminal case where a court must determine probable

9    cause as a matter of law—a determination which is itself a matter of judgment about which

10   reasonable judges can disagree—in the context of a summary judgment motion in a § 1983 case,

11   there is a second layer of difficulty because the question is whether a reasonable fact-finder could

12   find a lack of probable cause. The distinction arises because in the former case the probable

13   cause determination is an ancillary evidentiary matter, whereas in the latter case it is an element

14   of a constitutional tort. To ignore the distinction would be to take from the jury the question that

15   Congress placed within its purview under the Civil Rights Act of 1871. *See* U.S. Const. amend.

16   VII; *Curtis v. Loether*, 415 U.S. 189, 193–94 (1974) (Title VIII of the Civil Rights Act of 1968)

17   ("The Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury

18   trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for

19   damages in the ordinary courts of law."). Even if a court believes there was ultimately probable

20   cause in a case, summary judgment is not appropriate against a § 1983 claim if the court believes

21   a reasonable fact-finder could disagree. Such is the case here. At this point, where a reasonable

22   fact-finder could find there was no probable cause as to mens rea, Heiman determined to arrest

23   Plaintiff on the theft charge. (*Id.* 5). He informed his supervisor, Senior Agent Russ Neil, of the

24   evidence and showed Neil the video tape. (*Id.*). Neil agreed with Heiman's findings. (*Id.*).

25   Plaintiff arrived at the offices of the Board without notification to Heiman on August 6, 2010,

1    and because Heiman was already prepared to arrest him, he did not ask Plaintiff any further

2    questions before detaining him. (*Id.*).  Plaintiff asked if he could avoid going to jail by repaying

3    the money, and Heiman told him that returning the money would remove the element of the

4    crime requiring him to keep the money after being informed of the rightful owner. (*Id.*).  But at

5    this point, Plaintiff had already been arrested.  Plaintiff then went to Harrah's with Heiman and

6    paid the $950. (*Id.* at 5–6).

7         The information known to Heiman when he detained Plaintiff might sustain a direct

8    finding of probable cause that Plaintiff had committed the crime of theft, but it might not.

9    Plaintiff had indeed flatly refused, to Heiman and others, to return the $950 Harrah's claimed he

10   had been overpaid.  The statute at issue requires that a person "knowingly control[] any property

11   of another person with the intent to deprive that person of the property." Nev. Rev. Stat. §

12   205.0832.  "'Knowingly' indicates a knowledge that the facts exist which constitute the act or

13   omission constituting a crime, and does not require knowledge of its unlawfulness.  It is a lesser

14   mens rea than intent.  Knowledge of any particular fact may be inferred from the knowledge of

15   such other facts as should put an ordinarily prudent person upon inquiry." Nev. Rev. Stat. §

16   193.017.  The evidence shows that a person of ordinary prudence in Heiman's position could

17   have concluded that there was a fair probability that Plaintiff retained funds, with the intent to

18   keep them, that he knew or that an ordinarily prudent person should have known were not his.

19   Particularly, Lee's report to Heiman that the maximum winnings on a single hand of baccarat at

20   table no. 316 was $2000 (minus commission), coupled with the video evidence Heiman reviewed

21   showing Plaintiff leaving with $3000 in winnings (minus commission) on a single hand, would

22   lead a person of ordinary prudence to believe that Plaintiff, an experienced baccarat player,[2] had

23   left the table with winnings that he knew or should have known were not rightfully his.  There is

24   ───────────────

25        [2]Plaintiff admits playing baccarat four to five days a week for an hour at a time, betting an
     average of $50 to $100 per hand. (Conner Dep. 19:5–13, Sept. 19, 2009, ECF No. 47 Ex. 1).

1    also ample evidence of Plaintiff's refusal to return the money after the error was specifically

2    pointed out to him, such that a person of ordinary prudence would conclude that Plaintiff

3    intended to keep the money.  Still, the evidence that Plaintiff knew he had been overpaid in the

4    first place is weak.

5          In a criminal context, a finding of probable cause would mean that any evidence that was

6    a fruit of the arrest need not be excluded.  In the present context, however, a finding that there

7    may have been probable cause simply means that Plaintiff is not entitled to summary judgment

8    on the § 1983 claim, but not that Defendants are themselves entitled to summary judgment.

9    Because a reasonable fact-finder could decide the probable cause question either way,

10   Defendants have not met their initial burden of proof on this cause of action.

11         Plaintiff also argues that a reasonable juror could conclude that Heiman was motivated to

12   arrest Plaintiff by animosity he felt for Plaintiff after Plaintiff impugned Heiman's integrity.  But

13   subjective motivations are totally inapposite in a probable cause analysis. *Whren v. United States*,

14   517 U.S. 806, 813 (1996).  The question is whether an ordinarily prudent person in the position

15   of the arresting officer would conclude under the totality of the circumstances that there was a

16   fair probability the suspect committed a crime. *Pringle*, 540 U.S. at 370–71.  That an arresting

17   officer may take vengeful delight in arresting a suspect who has insulted him, or even that

18   revenge is the sole subjective motivation for an arrest, is of no import.

19         Plaintiff further argues that he has never admitted an overpayment.  But this does nothing

20   to negate the evidence available to Heiman when he made the determination to arrest Plaintiff.

21   Heiman could have had sufficient evidence to form probable cause regardless of Plaintiff's

22   denial.  Plaintiff also argues that a reasonable juror could conclude that Plaintiff reasonably

23   refused to accept the assertion that he had been overpaid at the table without having been shown

24   the video tape.  But "knowledge" under the Nevada criminal statutes does not require a

25   subjective belief by a suspect, or proof shown to him, that he has committed a crime.  Rather,

"[k]nowledge of any particular fact may be inferred from the knowledge of such other facts as should put an ordinarily prudent person upon inquiry." Nev. Rev. Stat. § 193.017. Heiman may have had probable cause to believe that Plaintiff, an experienced baccarat player, should have been put on notice of his having taken more than he legitimately won by the fact that he took more that the maximum winnings possible on a single hand at table no. 316. But a reasonable jury could find a lack of probable cause here.

Finally, there is qualified immunity if an objectively reasonable officer would not have known under these circumstances that he did not have probable cause. *See Torres v. City of L.A.*, 548 F.3d 1197, 1211 (9th Cir. 2008) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The question is whether "there [i]s enough evidence for a reasonable jury to conclude that reasonable officers would not have acted as [Heiman] did in arresting [Plaintiff]." *Id.* at 1212 (citing *Grant v. City of Long Beach*, 315 F.3d 1081, 1090 (9th Cir. 2002)). Here, a reasonable jury could conclude that an objectively reasonable officer would not have arrested Plaintiff based on the evidence available, specifically, the lack of evidence as to knowledge that he had been overpaid. The evidence indicates no question of fact as to probable cause to find a mens rea of criminal negligence, but a reasonable jury could find that a reasonable officer should not have concluded that the evidence showed probable cause of knowledge.

### C.    Civil Conspiracy (Harrah's) and § 1983 Conspiracy (All Defendants)

"An actionable civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Collins v. Union Fed. Sav. & Loan Ass'n*, 662 P.2d 610, 622 (Nev. 1983). "A private individual may be liable under § 1983 if she conspired or entered joint action with a state actor." *Franklin v. Fox*, 312 F.3d 423, 441 (citing *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 783 (9th Cir.), *cert. denied*, 534 U.S. 1020 (2001)).

The alleged conspiracy between Harrah's and the State Defendants concerns the alleged

1   conversion of Plaintiff's funds and a conspiracy to deprive him of his civil rights. Plaintiff's

2   claim for conversion does not survive summary judgment. It is possible that a conspiracy claim

3   can survive where the claim for the underlying harm fails because the underlying harm was not

4   carried out, but a plaintiff must show a genuine issue of material fact that the defendants agreed

5   to carry out a wrongful act against the plaintiff. The record is totally devoid of any such evidence

6   in this case with respect to the conversion claim. Plaintiff has admitted he has no direct evidence

7   of any agreement. (*See* Conner Dep. 64:22–65:5, 66:1–7, 71:4–8, 71:14–74:17, Sept. 14, 2009,

8   ECF No. 47, Ex. 1).

9          Plaintiff responds that a conspiracy can be inferred from the evidence. Plaintiff notes that

10  Harrah's employee Webbert told Plaintiff that he would receive the call from Heiman that he did

11  in fact receive, and that afterwards, Heiman told Webbert that he had called Plaintiff. But

12  Plaintiff simply alleges communication between a law enforcement agency and a criminal

13  complainant/victim after a crime allegedly occurred. A reasonable jury would have no evidence

14  from which to conclude that Defendants conspired against Plaintiff to wrongfully convert his

15  money, because it appears there is no dispute that Plaintiff was in fact overpaid. However, there

16  remains a dispute as to whether Defendants cooperated when Harrah's reported a crime and the

17  State Defendants then investigated it, arrested Plaintiff on probable cause, and facilitated the

18  return of Harrah's money (a civil debt) via the threat of criminal prosecution. The Court

19  therefore grants summary judgment on the claim for civil conspiracy, but not on the claim for

20  § 1983 conspiracy.

21         **D.    Respondeat Superior Liability and Negligent Supervision (Harrah's)**

22         Because the only claims that survive are under § 1983, and because there is no respondeat

23  superior liability under § 1983, *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), the Court

24  grants summary judgment on this cause of action. Furthermore, Plaintiff adduces no evidence of

25  the "grossly negligent supervision" required to show supervisor liability for a civil rights

1    violation. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

2                         **CONCLUSION**

3        IT IS HEREBY ORDERED that the Motions for Summary Judgment (ECF Nos. 46, 47)

4    are GRANTED in part and DENIED in part.  Summary judgment is granted on the conversion,

5    civil conspiracy, respondeat superior, and negligent supervision claims but denied on the § 1983

6    and § 1983 conspiracy claims.

7        Dated this 20th day of October, 2010.

8

9

10                              ROBERT C. JONES
                            United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25